The Water Works Board of the City of Birmingham (The Board) appeals from a final judgment of the Circuit Court of Jefferson County declaring a three-zone rate schedule adopted by the Board for water sold by meter measurement and all fire hydrant charges to be unlawful and unreasonable, and permanently enjoining the Board from the collection of charges pursuant to that schedule.
The issues raised on this appeal are as follows:
 1. Did the trial court err in substituting its judgment for the Board's with regard to the lawfulness of a three-zone rate schedule?
 a. Should the trial court have presumed that the rate adopted by the Board was valid, and considered whether any rational basis for its validity existed?
 2. Did the trial court err in holding that the Board did not have the authority to establish zone rates based on differences in the cost of service?
 a. Did the trial court err in concluding that previous case law requires strictly uniform rates for a water system?
 3. Did the trial court err in deciding that the plaintiffs had successfully demonstrated that the zone rates were not even arguably supported by differences in cost of service, but were arbitrarily and capriciously established?
We answer these questions favorably to the Board and reverse the decision of the trial court.
Although both parties have set forth in their briefs an exhaustive exposition of the facts, we believe the following are most important for a clear understanding of this case:
In March 1980, the Board announced that it had adopted a three-zone rate schedule to be effective on April 1, 1980, for water sold by meter measurement and on October 1, 1980, for public and municipal fire hydrants. The three zones were established as follows:
 Zone 1 — City of Birmingham and cities of Vestavia Hills, Fairfield, Homewood, Mountain Brook, and Tarrant City;
 Zone 2 — Other cities and unincorporated areas of Jefferson County within current central rate boundaries;
 Zone 3 — Areas of Jefferson, Shelby, St. Clair, and Blount Counties within the current rural boundaries.
The Board's basis for adopting this three-zone schedule, which the Board itself had conceived, was a cost of service study conducted by Arthur Young and Company, an independent consulting firm.
The Board indicated that several assumptions approved by the American Water Works Association (AWWA) should underlie the study performed by Arthur Young Co. First, that a zone rate should represent an average rate for all customers in that zone. Second, that the allocation of costs within the zones should be based upon the relationships of average day, maximum day and maximum hour demand patterns. Allocation on this basis calls for the use of the base-extra capacity rate-making method. Third, that fire protection costs should be determined for each zone and, that rate schedules should be structured to recover such costs.
The Board directed that two other assumptions, both of which pertain exclusively to the Birmingham system, should be made. First, that the allocation of costs in the study should take into account a contract *Page 298 
for the sale of water by the Board to the City of Bessemer. Second, that water from the Board's own Cahaba River-Lake Purdy Supply should be allocated only to Zone 1, while water purchased by the Board from the Birmingham Industrial Water Board should be allocated to Zones 2 and 3. This last assumption was predicated on the fact that the Cahaba River-Lake Purdy Supply had been sufficient to meet the demand for water when the area now in Zone 1 was all that the Board supplied. The Board alleged that the demand created as a result of expansion into Zones 2 and 3 was the primary reason for the purchase of water from the Industrial Water Board.
Arthur Young Co. used a five-step process in preparing the cost of service study for the Board. The first step was the determination of the total amount of revenue required to operate, maintain and develop the water system. This was done strictly on a cash basis.
The second step was the allocation of revenue requirements among the zones. As to operation and maintenance costs, allocation generally was made according to the amount of water consumption, except that all costs attributable to the Cahaba River-Lake Purdy Pumping Station were allocated to Zone 1 in accordance with the assumption concerning the distribution of that supply. As to capital costs, the following chart, prepared by the Board, indicates the basis of allocation for each item:
Allocation of Capital Costs to Zones
1. Existing Debt Service — Net Book Value
2. Proposed Debt Service — Net Book Value
 3. Repair, Replacement, and Improvement — Water Consumption
4. Debt Reserve — Water Consumption
5. Capital Outlay — Water Consumption
The allocation of debt service according to net book value was opposed by the plaintiffs. As a result of such opposition, Arthur Young Co. considered the strict allocation of debt service to debt-bearing assets, having previously identified the debt-free assets in the system. According to calculations done by Arthur Young, allocation of debt-service to Zone 3 was the same for both methods, namely 22%. In any event, there was testimony at trial that though the allocation of debt service might be considered prejudicial to Zone 3, any inequity was offset by the allocation of capital outlay on the basis of water consumption. Zone 3 was charged with $126,000.00 of capital outlay, when allegedly, $2,000,000.00 was for Zone 3.
The third step in the preparation of the cost study was the allocation of zone costs to cost functions. The cost functions used were:
1. Base Cost
2. Excess Capacity Cost
Sub-divided into:
(a) maximum day cost
(b) maximum hour cost
3. Customer Costs
4. Direct Fire Protection
Allocation according to these functions was intended to place the expense of meeting extra demand on those customers responsible for demand in excess of the average.
Having identified the applicable cost functions, completion of the third step of the study required the allocation of operation and maintenance costs and capital costs to the functions. This process involved the development of zone peaking factors (ratio of peak demand over base demand), which were prepared for Arthur Young by CH2M Hill, an engineering firm.
The remaining two steps in the development of the study were the allocation of zone costs to customer classes and the designing of rates for water use blocks. Neither of these intra-zone processes has been questioned by the plaintiffs.
Subsequent to the application of the rates under the three-zone schedule to individual resident customers on all bills rendered after the effective date of April 1, 1980, four suits were filed in the Circuit Court of Jefferson County, all of which alleged that the new rate schedules were *Page 299 
unenforceable. Following the consolidation of these cases, the parties agreed to try only two issues initially: the lawfulness and reasonableness of the rate schedule as it related to both water sold by meter measurements in Zone 3, and the increase of the hydrant rental charge for public fire protection in Zone 2.
The trial court rendered a judgment in favor of the plaintiffs, holding that the rate schedule for water sold by meter measurement, effective on all bills rendered on or after April 1, 1980, and all five hydrant charges effective October 1, 1980, were unlawful and unreasonable. The court's findings of fact included the following:
1. that the boundary between Zones 1 and 2 was established on the basis of a 1951 agreement between the six cities in Zone 1 and the Board;
2. that the boundary between Zones 2 and 3 was, at least, partially based on political boundaries and not on physical differences between the areas;
3. that the water system is "one unified complex integrated system" and that "it is difficult, if not impossible, to determine the actual cost to the customers in the various zones;"
4. that areas annexed by cities within Zone 1 would automatically be accorded Zone 1 rates, without reference to cost of service.
The trial court concluded that the Board was required to charge uniform rates for all customers in the same class (e.g., residential, industrial, commercial). The Board appeals.
The Board has argued persuasively that in creating the three-zone rate schedule, it was acting legislatively and, therefore, the schedule ought to have been presumed valid by the trial court. Having carefully read the trial judge's opinion in this case, we have found no indication that this presumption was accorded the Board's decision. Also, we do not think that the trial court properly considered whether the extensive evidence presented regarding the differing costs of service for the zones constituted a rational basis for charging customers according to different zone rates. The finding of such a rational basis would be sufficient to uphold the challenged legislative classification. Wilkey v. State ex rel.Smith, 244 Ala. 568, 14 So.2d 536 (1943). Moreover, we are convinced that the trial judge, based on an erroneous view of the law, substituted his judgment regarding the schedule for that of the Board, which evidently was not evaluated with reference to the finding of the cost of service study performed by Arthur Young Co.
The trial court was of the opinion that this court's decision in the case of City of Montgomery v. Greene, 180 Ala. 322,60 So. 900 (1913), second appeal at 187 Ala. 196, 65 So. 783
(1914), mandates invalidation of the three-zone rate schedule adopted by the Board. We disagree. The holding of City ofMontgomery v. Greene was essentially that "a different rate, fixed wholly upon the corporate lines as the line of demarcation . . . is an unreasonable classification." (Emphasis added.) 180 Ala. at 329-30, 60 So. at 902. We do not interpret this holding to mean that political boundaries cannot be used in any way to delineate a difference in rates. We would need to ignore much of Justice Anderson's thoughtful opinion for the appeals in that case in order to reach such a conclusion.
As indicated by the portion of the City of Montgomery v.Greene opinion quoted above, the court's objection was to "unreasonable classifications." In a subsequent part of the opinion, the court noted that
. . . the supplying of water and the rate charged is in no sense the exaction of a duty or tax, but is the mere furnishing, as a monopoly, a public necessity, and which must be supplied to all consumers alike, and without unreasonable discrimination either as to price or classification.
(Emphasis added.) 180 Ala. at 330, 60 So. at 902. Implicit in the language of both these sections of the opinion is the recognition that there are classifications and "discriminations" that are reasonable, and, *Page 300 
therefore, can serve as legitimate bases for different rates.
This court has indicated that "physical differences" are required to justify separate classifications for rate-making purposes. Id.; City of Montgomery v. Greene, 187 Ala. at 198,65 So. at 783 (second appeal). The trial court opined that Cityof Montgomery v. Greene "denotes the definition of physical differences wherein the Court clearly provided that customers on the same main could not be charged different rates. . . ." We disagree. It is clear from the opinion for the first appeal that even if two groups of purchasers are supplied from the same main, physical differences with respect to the two sides of a political line may constitute a sufficient basis for classifying the two groups differently in setting rates for service. 180 Ala. at 329-30, 60 So. at 902.
Having carefully reviewed the record and briefs in this case, we conclude that at least four physical differences supported the Board's action establishing a central and a rural rate in 1973, and its subsequent decision setting up an intermediate zone as part of the three-zone rate schedule, in place of the central-rural scheme. Those four variables were as follows:
1. Population density
2. Distance from filter plant
3. Vintage/Age of system
4. Peaking factor
In addition, the amount of water required for fighting fires and the density of hydrants differed for each zone. Moreover, uncontradicted testimony at trial indicated that the average
pattern of land use was different in the three zones. It was the opinion of the Board that these factors were highly determinative of the cost of service for customers. That opinion was substantially verified by the cost of service study prepared by Arthur Young Co.
The Supreme Court of Errors of Connecticut has addressed the factors that must be considered in order to properly decide whether and to what extent a departure from uniform rates is appropriate for a water system. The court said:
 In a case involving a large municipality and smaller surrounding towns, a higher rate may be prescribed for consumers in the smaller communities, without unlawful discrimination, provided it is not unreasonably high in comparison with the city rate, considering the respective costs of service and other conditions affecting rates. Such a differentiation, however, logically involves an apportionment of values, revenues and expenses. [Citations omitted.] The difficulties attendant upon making approximately accurate allocations and fixing fair or satisfactory zone or other differing rates are manifest, and are not to be undertaken unless there are such differences in circumstances and conditions between different parts of the territory served as to justify departure from uniform rates.
New Haven v. New Haven Water Co., 118 Conn. 389, 412,172 A. 767, 776 (1934). We agree with this analysis, and think that the physical differences discussed above reasonably buttress the Board's establishment of the three-zone rate schedule in order to recover differing costs of service. Moreover, as the plaintiffs have failed to demonstrate that the zone rates do not, on the average, reflect differences in the cost of service, as documented in the Arthur Young Co. report, there can be no finding that the Board's action was arbitrary and capricious, or that it was not "fairly debatable." See City ofGadsden v. Downs, 412 So.2d 267 (Ala. 1982).
For the foregoing reasons, we reverse the judgment of the trial court, and remand for proceedings consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur. *Page 301